Yes, Your Honor. Well, yes, I'll answer your doublehead compound question. Good morning, and may it please the Court. I'm Judith Hadley from the Department of Justice, representing the Commissioner in this case. The tax court decision in this case presents the same problem that Congress sought to remedy when it amended Section 482 in 1986 and directed the Treasury Department to revise its transfer pricing regulations. And it's the problem of the pricing of high-profit intangibles that are licensed by a U.S. corporation to its foreign subsidiary by relying on transactions that simply are not comparable. In response to Congress's mandate, the Treasury Department revised its regulations and promulgated the regulations that are at issue in this case. Those regulations were designed to tighten the standards for relying on the comparable uncontrolled transaction method, which the parties refer to as the CUT, please excuse the acronyms, and to provide alternative methods for pricing such transfers when there's not a comparable, including the comparable profits method utilized by the Commissioner here, which the parties refer to as the CPM. The tax court disregarded these regulations by treating the paysetter agreement as a CUT without engaging in the required regulatory analysis and by rejecting the CPM for reasons that conflict with the regulations. And in doing so, we believe that the court undermined Congress's intent and Treasury's remedial efforts by treating a transaction as comparable that's essentially nothing like the intercompany licenses and allowing Medtronic to allocate almost 50 percent of its profits to a foreign subsidiary that's engaged in one major function and incurs 13 percent, or I'm sorry, only 11 percent of the relevant costs. In this way, the sub is allocated income that does not reflect its relative contributions to the income at issue and therefore is not an arm's length price. I'll first address the court's CUT analysis. And the tax court was only by ignoring much of the required regulatory analysis that the court was able to conclude that the paysetter agreement and the intercompany licenses were at all comparable. The tax court ignored the vast differences between the intangibles at issue. The regulations require the CUT method to apply that the intangibles be comparable. Here, the tax court's findings demonstrate they're not comparable at all. In the paysetter agreement, it was just the patent that was the only intangible, whereas the intercompany licenses, it's the full bundle of intangibles that's required to make and sell the devices at issue, including the very valuable regulatory approvals. The court found that Medtronic had gone to great expense and time obtaining these required regulatory approvals, and under prior tax court precedent, the G.D. Searle decision, a transaction with regulatory approvals was not comparable to a transaction that lacked the regulatory approvals. The tax court should have reached the same conclusion in this case. The tax court also failed to consider the different circumstances of the two transactions. The paysetter agreement was a litigation settlement. Of course, the intercompany licenses is not. Paysetter and Medtronic had sued each other. There were nine lawsuits going on, including paysetter having sued Medtronic for antitrust and patent infringement, and again, prior tax court precedent in the POD decision, the fact that a transaction was a litigation settlement precluded it from being entered into under comparable circumstances to be used for the cut. The fact that litigation settlements are sometimes relevant in patent litigation does not mean that they are entered into under comparable circumstances under the transfer pricing regulations, and we do want to point out that even with the Federal Circuit case law and patent litigation, if a litigation settlement involves a cross license, even there, it's not relevant. Again, the court just failed to engage in this regulatory analysis. The tax court also failed to account for the fact that two transactions had different consideration. The regulations require comparison of significant contractual terms, including whether there are any collateral transactions or the consideration in each. Here, the paysetter agreement had lump sum payment of $75 million. It also had a cross license. Again, in prior tax court precedent, such consideration would preclude a transaction from being considered comparable to a transaction like the intercompany licenses that did not include such consideration. The tax court also failed to engage in the required functional analysis. It didn't analyze the functions that paysetter would have to engage in under its transaction versus Medtronic Puerto Rico. And this is critical because the regulations spell out that the functional analysis is particularly relevant under the cut method as opposed to the CPM method, and the court, in this sense, inverted the regulatory standards because one of the reasons that it rejected the commissioner's CPM method is because there were differences in function, and it didn't even analyze whether there were differences in functions under the cut, even though it's particularly relevant there. So this is another one of the flaws that allowed the court to treat the paysetter agreement as a comparable. The tax court also failed to analyze the profit potential of the two agreements, and the regulations say that to use the cut method, you must have intangible property. It must have comparable property, and for property to be comparable, it must have similar profit potential. The tax court noted this regulatory requirement and criticized Medtronic's expert, Burniman, for failing to engage in this required analysis. The tax court did the same thing. It did not determine what was the profit potential of the paysetter agreement and what was the profit potential of the intercompany license, even though the commissioner had provided evidence that their profit potential was vastly different. The operating profit margins, there was a 35% difference. Medtronic's was 35% higher than paysetter's, and the testimony in the case is that profit margins are the drivers of royalty rates. The court just ignored this evidence that demonstrated that the profit potential was not similar and made an arbitrary adjustment of 3.5, just treating the transactions as comparable without engaging in that profit potential analysis. And finally, the last flaw with the tax court's cut analysis is that it failed to evaluate whether the results of the cut transaction were reasonable. And as I noted before, the results of the court's cut analysis is that it allowed Medtronic to allocate almost half of its profits from the devices and leads to its foreign subsidiary, even though its economic contributions were far less than this. If the court had engaged in that required analysis, we don't think that it would have reached the result that it reached here, and it certainly is not an arm's length amount. One wonders why the tax court failed in all of these aspects of its ruling. I don't know, Your Honor. The only thing that we know is that the court did fail. The first half of its random opinion, which is very interesting, is sort of a pay-on to Medtronic's. And I'm glad they're doing good work, but it's an interesting opinion. I learned a lot about medical devices and how Medtronic operates. I agree it was interesting in that extent, but what we're concerned with is what's not in the opinion, and what's not in the opinion is the required regulatory analysis under the cut. That's why I asked. I wonder why the tax court seemed to be quite knowledgeable about the regulations and all of the law. Again, to summarize all these failures, what reason could we come up with that would justify what the tax court did? Of course, the other side's answer is we don't have to do that. The tax court is presumptively correct if you read their brief. If you read their brief, they treat the case as a purely factual case that this court should defer to. And we have two responses to that. From our point of view, this is not a purely factual case. It's a case in which the court has failed to apply the regulations that were designed to address a concern that Congress had. This was a purely factual case. We'd probably not be here if the government doesn't appeal every time a valuation case takes place and we don't get the result that we want. This is the first case to actually engage and analyze the CPM method, which is a method that the Treasury Department enacted to apply where there are product and functional differences. And it's more flexible, but it's to apply when there are not any comparable transactions, which is what Congress was responding to in 1986 when it amended the statute. Right. And what was Congress's overriding concern at that time? You've stated it, but why don't you restate it? Sure. Its overriding concern is that intangibles were being priced at prices that were less than arm's length and that corporations were allocating more income to foreign subsidiaries than would be reflected by their economic contributions. And this erodes the U.S. tax base. And that the way courts were doing this is because they were relying on transactions that were not comparable. Under the earlier 1968 regulations, the cases that we cite like G.D. Searle and Seagate and Sundstrom were decided under, there was a hierarchy of methods. The courts were to, under the regs, you apply the cut method, essentially. And for the cut method to apply, there was just a general test of similar intangibles under similar circumstances. And if you didn't have a cut, then there were certain factors that you would look to to price. But the 1994 regs, which are the regulations at issue in this case, overhauled that. There's no longer a hierarchy of methods. The best method is to apply. And there are now strict requirements that the court must go through before the cut can apply. And the court's analysis of the CPM method, we believe, conflict with the regulations and also with the record. Unless the court has any other questions on the cut that's going to address the CPM. I have a couple of questions. Sure. You talked about the deficiencies in the tax court's analysis of the cut comparator in this case. And I wonder if there's an analogy to patent law that is helpful in determining patent damages. There's often an effort to refer to a hypothetical transaction that would have taken place when the infringement began. Are some of those factors applicable or transferable here in this context? I'm not familiar with what the factors are in the patent context. What Treasury tried to do was to provide tests for the court to apply. There's the cut method. There's the CPM method. And there are other alternative methods that are not at issue in this case. But those methods provide the factors that should be applied in the tax case. I do know, as I noted before, that in the Fed Circuit case law, that they would not look to a litigation settlement that has a cross license to provide guidance. Okay. My other question is, maybe I misunderstood you, but is it the government's position that there is a hierarchy of methodology? No, there is no longer a hierarchy of methodology. The cut method is not a preferred method as it had been under the prior regulations. Okay. And then finally, the standard of review here, the tax court rejected the CPM method application, which was proposed. And I guess we have to review that. But is that going to be a clear error, factual issue, standard of review in your determination? Or is it de novo? In our view, it's de novo because it's a mixed question of fact and law. The court's failure to apply the regulations or to determine that the CPM method was invalid for reasons that conflict with the regulations raise a legal issue. For example, the court complained that the commissioner's expert, Heimert, relied on the book value of the assets rather than their fair market replacement value. And the regulations expressly provide that the book value can be utilized as long as it's being utilized consistently, which is what Heimert did. And again, this was a method that was developed to allow parties to fairly transfer, I mean fairly price transfers when there are not cuts available. So it's designed to be flexible, and one of the flexibility of the CPM is that it does rely on publicly available information, which is the book value of assets as opposed to the fair market value, which would be much more difficult to engage in. But I will say that even if the court were to disagree with what our view of the standard of review is, even if it were a purely factual case, that does not mean that this court rubber stamps it. I point this court to the State of Palmer case where it reversed a tax court determination that two types of property were substantially similar. There, the court had held that a single family home and a mansion were similar, and this court said, no, they're not similar, even as a matter of common sense, and reversed the case for the court to apply the taxpayer's method. In this case, I think analogously, the paysetter agreement is the single family home, whereas the Medtronic intercompany licenses are the mansion. You know, I'm going to be a little bit confused. It strikes to me that we do, in fact, give some deference to the factual findings and that the fact findings themselves are subject to review on clear error, but the legal conclusion is de novo. And that your real argument is that without citing these things to the nine digits that it takes to get to the section, that really what you're telling me is that, you know, under 482.1d, 482.4c, and 482.1c, that no facts were found by the tax court and no adequate explanation was given so that we can rationally understand the analysis. Now, is that, in fact, the argument that you've made? Yes, that is part of the argument that was very well said. Thank you. I just wanted to make sure I was following you because this is complicated. It is complicated, but interesting. The other flaws of the court's rejection of the CPM method is that it rejected the CPM because it thought that the comparables had different products and different functions, and, again, this inverts the regulatory standards. The court accepted the cut despite functional and product differences but rejected the CPM because of functional and product differences and also ignoring the regulations, which we've summarized on page 31 of our reply brief, that make any differences between product and function less of a problem in this case. One quick point before I try to save a few minutes for rebuttal is that we do have the alternative argument that if the court were to be of the view that the cut could be treated as the paysetter agreement could be treated as a cut, that there would be a remand needed in any event to correct the court's paysetter-based royalty rates, and we've argued that for three reasons that we need a remand. I think we've set this out in detail in the briefs, but if the court has any questions about that, I'd be happy to respond to it. Apparently not. Thank you. Okay. Thank you. Thank you, Your Honors. Good morning, Counsel. You may proceed. Thank you, Your Honors. I'll let you pronounce it because I haven't met you. Thank you, Your Honor. May it please the court. My name is Thomas Linguanti. You may want to raise the lectern. No, I mean there's a button over on the side. Cool. Thank you. Hey, it's like the Academy Awards. Very good. Thank you. Thank you, sir. Again, I am Thomas Linguanti, and I'm appearing on behalf of Medtronic. Good morning to you. Good morning to Counsel. Your Honors, the government's briefing and, in fact, the oral argument just a moment ago all focused on what the tax court did not do and perhaps what the government believes the tax court should have done. So it seems useful, perhaps, to take a moment and focus on what actually the tax court did and to focus on what it was, in fact, charged to do under the very regulations the government relies on. What it was charged to do is, under Treasury Regulation Section 482-1C, and, in fact, an unbroken string of tax court precedent starting going back as far as U.S. Steel, let alone Eli Lilly and others, is that under the, quote, facts and circumstances, the court is charged with determining the, quote, most reliable measure of an arm's-length result. That's what the court was charged to do. It was determined under the facts and circumstances after six weeks of trial, 47 fact witnesses, 11 expert witnesses by Medtronic, 10 expert witnesses by the government, to determine whether these competing methodologies under the facts and circumstances were the most reliable measure of an arm's-length result. The arm's-length standard has been built into these Treasury regulations through all these changes, including the 1994 changes, since 1935. And what the tax court then did was it looked at the government's, the government keeps referring to this as a CPM, but that is not what the tax court was presented with. What the tax court was presented with was a value, a theoretical value chain methodology to value the relationships among the Medtronic entities, Medtronic Puerto Rico, Medtronic, Medtronic MedUSA, which is the distribution company, and value those relationships and then divvy up the profits. That's what the court was faced with. And what the court found, as a matter of fact, not at all to rubber stamp it, Your Honor, but in order to consider what the tax court did, what the tax court said, this does not reflect Medtronic Puerto Rico's contributions, contributions to the value chain that the government's expert has proposed. Judge Wolman, you made the observation about the front part of the tax court's opinion, 144-page opinion, focusing on Medtronic. Well, it had to, because those were the facts. The government's methodology required Medtronic to come forward and say, OK, if you're going to value the relationships, then you need to understand the relationships. And Medtronic Puerto Rico has been manufacturing implantable class 3 devices in Puerto Rico since 1974. Pacemakers, implantable cardio defibrillators, more recently, neurostimulation devices. And that company has been the registered FDA facility for Medtronic for nearly 30 years by the years at issue. And the court looked at those facts and understood what were the contributions of Medtronic Puerto Rico to the relationships. And the court found that the government's methodology simply, under the facts and circumstances, was not the most reliable measure of an arm's length result. Arm's length is a commercial term, by the way. It's not a theoretical term. It's a real term. So then the court was— Do we have to look at Medtronic's underlying motivation for manufacturing these things in Puerto Rico? We don't have to at all, although the reason they were in Puerto Rico, Your Honor, is the same reason many companies were in Puerto Rico back then, because Congress had enacted what was then called Section 936 of the Internal Revenue Code, which encouraged companies to go and build manufacturing facilities in Puerto Rico to build up and develop a skilled workforce. And to Congress's great credit, that's exactly what happened. So Medtronic and a number of medical device companies, companies like Coca-Cola, have had manufacturing facilities, and a number of them still exist today in Puerto Rico. What percentage of the profits are allocated to Puerto Rico? In what sense, Your Honor? In terms of tax consequences. Well— In other words, the overarching thing in this case, and we all know it, is to what extent can your company, your client, I should say, allocate as much of the tax consequences to Puerto Rico as it can? Well, if— And who's there, who's to protect the taxpayers, I guess? Maybe that's our question on our court. Sure. Well, but two things. First of all, the question is profits are as a result of prices. So the transactions, there were four transactions in this case. There was a transaction to purchase components, a transaction— Well, sure, absolutely true, Your Honor. But the regulations require, again, the regulations the government maintains, say you have to look at the transactions. And what the transactions do, when priced, lead to, under the licensing transaction, a little less than 50 percent of the profits ending up in Puerto Rico. But that's not unusual. In fact, that is the result that when the government looked at this the first time and entered into an agreement with the taxpayer as to what the correct royalty rates were and what the correct profit splits were, they agreed that that was an arm's-length result. That was appropriate sharing of profits. And I'd also suggest, Your Honor, that that's the result of pricing, that this amount of profit would end up in Puerto Rico, where Professor Pindyke, who is a micro—from MIT, he actually literally wrote the book on microeconomics. He looked at the paysetter license and the relationship between the licensor and licensee. And in that case, 71—and this is in the record—71 percent of the profits ended up with paysetter as the licensee, the analog to Medtronic Puerto Rico. So the profits that resulted were typical of a licensor-licensee transaction, when, like in this case, Medtronic Puerto Rico is the one charge with manufacturing. They're not making children's toys here. They're manufacturing class-three implantable medical devices. And a company that's manufacturing class-three implantable medical devices, the most highly regulated medical devices literally in the world, expects to receive some share of the profits as a result of its pricing of its transactions because of what it incurs. In this case, it's its involvement in the development of devices, it's involvement in the overall success of the organization, and frankly, the risks it takes on. Because at the end of the day, if Medtronic Puerto Rico manufactures a bad device and it causes someone to die, Medtronic Puerto Rico is the last one to touch that device. They're the ones responsible. So that's why the profits that result are commercially rational and make sense in light of the risks they take on  What relationship did the tax court's decision, in this case, bear to the allocation that your company reached back in 2005-2006? Well, how did the MOU and the results? Well, they end up coming together. You're referring to the membrane of understanding between the government and the taxpayer, I assume. Right. And in that case, after a full-blown, several-year audit, the government had determined that the arm's-length royalty rates, the correct royalty rates, and this was undisputed in the record, this was testimony from the government's examination team, the correct royalty rates were 44% for devices and 26% for leads. That's what the government's perspective was. But the methodology they used was much different than the methodology that was used at trial. The MOU was not based upon the value-chain methodology the government had. It was not based on the pay-setter license. It had a profit-split allocation, which said between devices and leads, approximately 40% to 50% of the profits would end up in Puerto Rico. The approaches were much different. Interesting, but in the tax court, having done its own analysis, having looked at different licenses and having had six weeks of trial, came to a similar result. Looked at different expert witnesses, obviously different factual record, and it's not unusual. In fact, it sort of tells you something when you go after the same question several different ways and they come to the same general conclusion. I mean, remember, this is an arm's-length question, so it's a valuation question. And while the court had to determine a royalty rate for both licenses, it's an arm's-length range of results. So could it have been 42%? Could it have been 46%? Who knows? It could have been all those things. Arm's-length in what respect? Well, the arm's-length standard requires that you price, in this case, the transactions as if. Not that they are unrelated, but as if they were unrelated. And you look at the transaction. This is why it's such an important difference in the way the United States looks at these issues than the way other people look at these issues, which is the arm's-length standard is a commercial way of looking at things. What do two unrelated parties, neither under compulsion to buy or sell, what kind of answer do they come to to the pricing of their transaction? So here, the pricing of the transaction that's at issue ultimately, the technology license, was in accordance with the arm's-length standard. And as a result, as the government had admitted below, if you determine the arm's-length answer to be, in this case, 44% and 26%, or 22%, excuse me, then that's consistent with the so-called commensurate with income standard in this case. The two are complementary. Not that we need a history lesson on treaties, but the arm's-length standard is the standard around the world. I call it the lingua franca of this area of the law because the United States insisted around the world when its companies were doing business that this arm's-length commercial term would be the way we judge how you tax companies. It's not like in state taxation where you have an allocation between states and they have formulas that they apply and they decide how much income should be in one state or another. It's the arm's-length standard, Your Honor, and that's what the court was charged to do, and that's what the tax court did here, which is determine an arm's-length result. As I understand, at least part of the argument by the government is that when you got to the methodology, that there was an inadequate explanation by the trial court of the actual factors that were used that acknowledged the differences between the pace-setter circumstances and the circumstances present in this case that explained which ones were significant, which ones were not, and explained in detail how that methodology was being applied, assuming that there was no comparable from which to work. And my question is, why are they wrong? Well, because they have ignored what the tax court actually did, first of all. And then secondly, I'll turn to what the law requires. So what the tax court actually did, every single factor, every single one that the government identifies as a failure of the tax court is in the tax court's opinion. Every one. So as an example, there's a question about the cross license. And by the way, the government is wrong about the AstraZeneca case, where they said that there was a cross license in that patent dispute and the court decided that it was inappropriate. That's wrong. If you look at the case, there actually is a cross license, and the court still used that litigation license. But I digress. But they make the point that the pace-setter agreement is a cross license, and therefore that was not taken into account. I would refer the court first to opinion at page 132 to 133, and this is the addendum, where she refers specifically to 142-4C, and as Judge Erickson suggested, several subparagraphs under that. And I would refer the court to the opinion at page 58 and the opinion at page 121. The court made the determination that it didn't matter. The government may not like that answer, but the court, having sat through six weeks of trial, until 7 o'clock on most nights, found that it didn't matter. Similarly, they make a big deal as one of the factors that this $75 million lump sum was not taken into account. They say the regulations require that it should have been taken into account. Well, I refer to the court to opinion page 132 to 133, and particularly 142-1D3 and several subparagraphs under that, which talks about form of consideration. The court was well aware of the lump sum payment, and consistent with the expert testimony, she made the determination, which under the facts and circumstances the government doesn't like, that it doesn't matter. Opinion page 58, opinion page 121. And, Your Honors, we can tick through each one of the different suggestions the government has made, and you will find it in the opinion. The government may not like the answer, but the court addressed each one of these factors. It's not a question of liking it. Was the tax court just wrong? As a matter of fact, of course not, Your Honor. As a matter of fact, the court made a judgment. I'll interrupt. I'm sorry for interrupting. Excuse me. The tax court rejected the government's expert testimony, pretty much. The value chain methodology of value relationships, yes. And what did the tax court say about your expert's analysis? Well, the tax court said that our expert analysis did not get to an arm's-length result either. And then the tax court was faced with the question, well, now what do I do? So, in fact, in our case, because if you recall from the record, Medtronic was seeking a $500 million refund because Medtronic filed its tax returns based upon what it determined to be the arm's-length result, not the MOU. So Medtronic's evidence was justifying the arm's-length numbers that Medtronic determined, and the court said, we don't agree with the approach Medtronic has taken, the comparable uncontrolled transaction method, and we appreciate the paycenter license, but we don't agree that what the expert did was sufficient. So what's the tax court to do? At this point, we're at equilibrium. I've looked at the government's method. Under the facts and circumstances, it's not the most reliable measure in arm's-length result. I've looked at the taxpayers' method. I've determined, the tax court, that under the facts and circumstances, it's not the most reliable measure in arm's-length result. Well, now, do we try the case again, as much fun as that might be? Of course not. What the court did, as it's charged to do, is made its best judgment. And what it did was say, well, take this, the one real commercial transaction that we have, where the testimony was, same intangibles, same markets, same customers, similar circumstances, similar profit potential, and I'm going to use this paycenter license to build an arm's-length result. And I'll make adjustments to it. And she did, some of which we would agree with, some of which we would not, but none of which are clearly erroneous. And she said, I'm going to build from this royalty rate what I consider to be the most reliable measure in arm's-length result. And that's what she did, and that's what she was charged with. Right. When you look at what she did, as I read the opinion and studied it, it looked to me like she rejects both experts. She then sits down and goes through some methodology, and she rejects some of the things that your expert suggested relatively out of hand and somewhat dismissively. And she rejected some of what the government's experts said somewhat dismissively and somewhat out of hand. And it is a 144-page opinion. You hate to say, man, it's got to be much longer. But there is not. When you look at the explanations actually offered as to why, for example, we find that the lump sum method doesn't really matter very much. It just sort of is. The underlying factual analysis isn't definite. It isn't stated with any great particularity. Now, I think what the government is arguing is essentially that once you decide on the method, you have to explain that method. And it's okay just to reject out of hand both experts, but that this particular explanation is in some way inadequate. And I know you disagree with that. And so I just want to give you a chance to fully and fairly state why that's a wrong analysis. Well, again, we've discussed some of what the government is saying is wrong and what they're suggesting is that these weren't addressed. But with regards to what the court did address, it was not inadequate. Let me take this a couple different ways. First of all, what the government then is demanding, if their analysis is right, in an evaluation case, which is what this is, right, is an evaluation case at bottom, they're demanding what would be, in this case, a 500-page single-spaced opinion that identifies every subparagraph, every sub-subparagraph, and every sub-sub-subparagraph that the court's going to be required to take through. There's a whole lot of other parts of the regulations that neither party has talked about she had failed to address. Why? Because they weren't relevant, ultimately, to her opinion. But you take the government's complaint to its conclusion, and that's what they're saying they need to do. The other thing I would suggest is that the real issue here, then, legally, put aside the factual disagreement we have with the government's analysis, legally, is that the difference between considerations and findings, and this court in Ham and many other cases talk about how, in an evaluation case, you have to recognize the court is making its best judgment based upon the facts it's presented. And it's not, by the way, it's the best method. It's not the ideal method. It's not the perfect method. It's the best method based upon what's been presented to her. But the question is, did she do enough? And in addition to the cases like Ham and others like that, it's interesting, we looked at some of the cases, once we knew that your honors were on the bench, said, well, did any of you three deal with these kind of questions before, as we do our due diligence? And there's a case called Contero, which you may recall, where Judge Erickson was the district court judge, and Judges Shepard and Woolman were the appellate court judges. And Judge By was the third member of the appellate panel. And it had to do with, and there's sentencing cases that talk about this as well, where the question is, can you draw from the judge's opinion sufficient analysis to say that they made, even though they did not make specific findings, is this appropriate? But in Contero, it had to do with a motion to suppress arising from a warrantless search. And I'll just quote, and Judge Erickson, sitting as district court judge, said, I issued an opinion making his determination, interlocutory appeal to this bench. And the court said, the government's argument suggests a mechanical analysis of the factors is required. After a, which we, which has been expressly rejected by this court on numerous occasions, after a careful review of the record, we reject any notion that the court was not aware of the factors it was required to consider. And that's Contero 648, F3, 660, 2011. And that's just an example, just happens to be your honors that were involved, of many cases, drawing that distinction between considerations and findings. Did the tax court consider all of the factors? Yes, as is identified in 144 page opinion. Did she make sufficient, did she make findings with regard to each one of the paragraphs and sub paragraphs that perhaps she should have on reflection and she wanted to have a 500 page opinion, maybe she would have? No, but she made the findings she had to make with regard to the considerations that matter to her judgment. And that's why both as a matter of fact, and as a matter of law, we believe that the tax court's opinion should be affirmed. Thank you, Your Honor. Thank you for your argument, thank you. A couple quick points. You may want to lower the lecture. No, the lecture, well, that should work. I'll stand on my tiptoes. There's a button. The button off. Thank you very much. Well, you have two minutes and 41 seconds to persuade us not to accept the siren song that we just heard. A couple quick things. Number one, the reliance on the arm's length standard actually supports the commissioner in this case, not Medtronic, because an arm's length price must reflect the party's relative economic contributions. And the tax court in this case failed to analyze whether Medtronic, Puerto Rico's economic contributions rose to the level of earning almost 50% of the profit in this case. It would not take a 500-page opinion for the court to have engaged in the required regulatory analysis. We engaged in our brief, and our brief is not 500 pages. Medtronic's reliance on the MOU is misplaced for a number of reasons. Number one, I believe I heard counsel say that the government agreed that that was the rates in that agreement were arm's length. That is inaccurate. We have the cites on page 18 of our brief. Both Medtronic and the IRS agents testified that that was not the arm's length amount. It was just an amount the parties agreed to to resolve the audit. It was a settlement. It was a compromise. But the arm's length amount, as the IRS agent testified, was the amount set out in the Goodman report, which was the transfer pricing study that analyzed the party's functions and concluded that only 10% of the profit should be allocated to Medtronic. The court in this case held that Medtronic, and this is on page 88 of its opinion in the agenda, that Medtronic cannot rely on the MOU because it's just an informal agreement. It cannot rely to disprove any of the government's theories. Medtronic has not appealed that legal holding of the court, nor could it because the court relied on binding precedent from this court, the Dinkins decision, in which the IRS had entered into an agreement after audits agreed with the taxpayer's method of valuing something. I think it was salvage value for depreciation purposes and agreed during the audit that it was 12%, but then said, no, it's actually 60%, and the court agreed and said the government was not bound. Does the court have any further questions? If I may. I want to thank both sides for the argument, that the arguments will sharpen our thinking. Whether it will make the decision easier, I don't know. But anyway, the case is submitted, and we will take it under consideration.